**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GORDON CASEY and DUANE SKINNER, individually and on behalf of all others similarly situated, <br><br>                Plaintiffs, <br><br>      v. <br><br> CITIGROUP, INC., CITIBANK, N.A., CITIMORTGAGE, INC., MIDFIRST BANK, N.A. d/b/a MIDLAND MORTGAGE, and FIRSTINSURE, INC., <br><br>              Defendants. | **AMENDED CLASS ACTION COMPLAINT** <br><br> Civil Action No.: 5:12-cv-820 <br>              (DNH/DEP) <br><br> Jury Trial Demanded |

Plaintiffs Gordon Casey and Duane Skinner ("Plaintiffs"), individually and on behalf of all others similarly situated, through their undersigned counsel, bring this Amended Class Action Complaint against Defendants Citigroup, Inc. ("CitiInc"), Citibank, N.A. ("Citibank"), CitiMortgage, Inc. ("CitiMortgage") (collectively, "Citigroup"), MidFirst Bank, N.A. d/b/a Midland Mortgage ("Midland"), and FirstInsure, Inc. ("FirstInsure") (collectively "Defendants").

## PRELIMINARY STATEMENT

1.     Plaintiffs and the Class have mortgages[1] secured by residential property, and were required to purchase flood insurance by Citigroup and/or Midland.

2.     Defendants have systematically violated the legal rights of Plaintiffs and Class members in two separate, independent and fundamental respects, as set forth below.

---

[1] The term "mortgage" as used herein also refers to deeds of trust and other types of security instruments.

3.      First, Citigroup and Midland unfairly, unjustly, and unlawfully forced Plaintiffs and Class members to purchase and maintain flood insurance in amounts greater than required by law, greater than required by their written mortgage agreements, and greater than Defendants' financial interest in their property.

4.      Second, Defendants unfairly, unjustly, and unlawfully profited from force-placing flood insurance on Plaintiffs' properties and the properties of Class members, by charging amounts in excess of the net costs incurred by Defendants for such insurance and by arranging for kickbacks, commissions or other compensation for Defendants and/or their affiliates in connection with force-placed flood (also known as lender-placed) insurance.

5.      Defendants engaged in this conduct in bad faith, knowing these actions were contrary to applicable law, reasonable commercial standards of fair dealing, and the reasonable expectations of borrowers upon entering into their mortgage agreements.

6.      Based on Defendants' conduct as alleged in detail below, Plaintiffs assert the following claims:

a)      breach of contract/breach of the implied covenant of good faith and fair dealing (against Citigroup and Midland);

b)      unjust enrichment (against all Defendants);

c)      breach of fiduciary duty/breach of trust (against Citigroup and Midland);

d)      conversion (against all Defendants);

e)      violation of the federal Truth-in Lending Act ("TILA") (by Skinner against Citigroup and by Casey against Midland); and

f)      violation of the New York Deceptive Practices Act ("NYDPA") (by Plaintiff Casey against Citigroup and Midland).

7.      Plaintiffs assert these claims on behalf of two proposed classes and two proposed subclasses (together, the "Classes") of Citigroup and Midland mortgagors, as defined below in Paragraphs 82 through 89.

8.      Plaintiffs and the Classes seek injunctive relief, corresponding declaratory relief, monetary relief, and other appropriate relief for Defendants' unlawful conduct.

## PARTIES

9.      Plaintiff Gordon Casey resides in Syracuse, New York.  Mr. Casey's mortgage loan uses the standard FHA form deed of trust.  His loan is currently serviced by Midland and was formerly serviced by CitiMortgage.

10.      Plaintiff Duane Skinner resides in Pasadena, Maryland.  Mr. Skinner's mortgage loan uses the Fannie Mae/Freddie Mac form deed of trust.  His loan is currently owned by Fannie Mae and serviced by CitiMortgage.

11.      Defendant CitiInc is a global diversified financial services holding company that conducts business throughout the United States.  CitiInc is a Delaware corporation with its principal place of business at 399 Park Avenue, New York, New York and as such, is a citizen of the State of New York.

12.      Defendant Citibank is one of the nation's largest banks, and has its principal place of business in New York, New York.  Citibank is engaged in the business of mortgage lending throughout the United States.

13.      Defendant CitiMortgage is an affiliate of Citibank.   CitiMortgage is headquartered in O'Fallon, Missouri, and services mortgages on behalf of Citibank throughout the United States.  At all relevant times, CitiMortgage's conduct was approved, authorized,

and/or ratified by CitiInc and Citibank, and CitiMortgage was acting as the agent of CitiInc and Citibank.

14.     Defendant Midland is headquartered in Oklahoma City, Oklahoma, and is engaged in the business of mortgage lending and servicing throughout the United States.

15.     Defendant FirstInsure is an affiliate of Midland, and is headquartered in Oklahoma City, Oklahoma.  FirstInsure is registered with the Oklahoma Secretary of State as a domestic for-profit insurance corporation.  FirstInsure does business in the State of New York, and receives commissions in connection with lender-placed flood insurance policies covering the property of Midland mortgagors in New York and other states.

## JURISDICTION AND VENUE

16.      This Court has federal question jurisdiction over Plaintiffs' TILA claims pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

17.     This Court also has original jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2).  Plaintiff Casey is a citizen of New York, Plaintiff Skinner is a citizen of Maryland, and three of the Defendants are citizens of different states.  The amount in controversy in this action exceeds $5,000,000.00, and there are more than 100 members of the Classes.

18.     Venue is proper in the United States District Court for the Northern District of New York pursuant to 28 U.S.C. § 1391, because Plaintiff Casey resides in this District, Defendants regularly transact business in this District, and a substantial part of the events giving rise to this Complaint arose in this District.  In addition, a substantial percentage of the members of the Classes are citizens of New York, many of whom reside in this District.

## FACTUAL ALLEGATIONS

### *The National Flood Insurance Program and Regulations*

19.     The National Flood Insurance Act, 42 U.S.C. § 4001, *et seq.* ("NFIA"), requires lenders to ensure that flood insurance coverage is maintained on any improved property securing a loan or line of credit that falls within a Special Flood Hazard Area ("SFHA").   Under the NFIA, the amount of coverage must be at least equal to the *lesser* of:  (1) the outstanding balance of the loan; (2) the maximum insurance coverage available through the NFIP, which is $250,000; or (3) the replacement cost of the property.  *See* 42 U.S.C. § 4012a(b)(1).

20.     The Department of Housing and Urban Development ("HUD"), which operates the Federal Housing Administration ("FHA"), also states that flood insurance coverage on FHA Loans need not exceed the outstanding principal balance of the loan.   *See, e.g.*, http://www.hud.gov/offices/cpd/environment/review/floodinsurance.cfm  (last  visited  July  20, 2012) ("**Dollar Amount of Flood Insurance Coverage.** For loans, loan insurance or guarantees, the amount of flood insurance coverage need not exceed the outstanding principal balance of the loan."); *accord*, 24 C.F.R. § 203.16a(c) ("flood insurance must be maintained . . . in an amount at least equal to . . . the outstanding balance of the mortgage").[2]

21.     Similarly, Fannie Mae and Freddie Mac provide mortgage servicers with guidelines  on  flood  insurance  requirements  for  their  mortgage  portfolios.   *See, e.g.*, https://www.e**fanniemae**.com/sf/guides/ssg/svcg/svc061011.pdf; *see also* http://www.allregs.com/tpl/Main.aspx.  Since at least 2007, the Fannie/Freddie guidelines are satisfied if the borrower maintains flood insurance coverage equal to the federal requirements.

22.     Loan  servicers  are  obligated  to  abide  by  Fannie  Mae's  and  Freddie  Mac's

---

[2] HUD's flood insurance requirements have not changed during the relevant time period.

guidelines on loans owned by those entities when servicing those loans.  The standard Fannie

Mae/Freddie Mac mortgage (such as Mr. Skinner's) distinguishes between contractual rights

reserved to the "Lender" or owner of the loan and those rights the *servicer* may assume.  The

right to set or change flood insurance requirements is reserved to the Lender.

    23.    Defendants are also incapable of setting or changing flood insurance requirements

applicable to FHA loans (such as Mr. Casey's).  The standard FHA deed of trust reserves the

right to set and change flood insurance requirements to the Secretary of HUD.

    24.     Loan servicers profit from servicing loans by extracting payments for themselves

or their affiliates, in addition to the principal and interest payments that are due to the lender.

For this reason, the kickbacks or "commissions" paid to servicers and their affiliates on force-

placed insurance are very lucrative for them.  Moreover, if the practices of the servicer lead to

default or modification of the loan, the servicer can collect even further payments and/or fees,

while being fully protected from any loss of principal on the loan, since that risk is fully borne by

the owner or guarantor of the loan.

    25.    Thus, without ownership of the underlying loans, Defendants suffer no

consequences if their force-placed flood insurance scheme forces borrowers into foreclosure

because that loss is borne by the owner of the loans.  The owner of Mr. Skinner's loan is Fannie

Mae.  In the case of Mr. Casey, who has an FHA loan, any default is insured by the FHA,

immunizing Defendants from any losses associated by default and foreclosure.

    26.    Defendants have engaged in a scheme to generate additional fees and income for

themselves by requiring borrowers whose loans they service to purchase additional flood

insurance in excess of the requirements under the NFIA, the mortgage agreements, the

requirements of HUD, and Fannie Mae/Freddie Mac's guidelines.  Through this practice,

6

Defendants generate significant profits for themselves through, *inter alia,* commissions, kickbacks, and in-kind payments and other fees.

### *History of Mr. Skinner's Mortgage Loan*

27.     On October 5, 2011, Plaintiff Skinner obtained a mortgage loan from Real Estate Mortgage Network, Inc., the originating Lender, in the amount of $142,000.  *See* Exhibit 1.

28.     The mortgage loan was secured by Mr. Skinner's home using the standard Fannie Mae/Freddie Mac security instrument/deed of trust.

29.     Subsequent to closing, Citigroup acquired the servicing rights as the loan was sold to Fannie Mae.

30.     The current principal balance of the loan is approximately $142,000.

### *Citigroup Refuses to Accept Prior Determination that Mr. Skinner's Home is Not in a SFHA*

31.     As part of and required for closing the loan, the originating Lender, Real Estate Mortgage Network, Inc., had a Flood Hazard Determination conducted by LandSafe Flood Determination, Inc. ("LandSafe"), a company whose primary function is to determine whether properties are in a flood zone that requires maintenance of flood insurance pursuant to the NFIA. *See* Exhibit 2.  LandSafe's Flood Determination, as captured on the Standard Flood Hazard Determination Form ("SFHDF"), states that Skinner's property is in Flood Zone "C", and that "flood insurance is not required by the Flood Disaster Protection Act of 1973."[3]

32.     As a result of the September 15, 2011 Flood Determination, Mr. Skinner was not required to have flood insurance in order to close the loan.  The loan closed on or about October 5, 2011 without the original Lender requiring flood insurance.

---

[3] Zones requiring flood insurance are noted with an "A" or "V".

33.     Almost immediately after Citigroup acquired the servicing rights to Mr. Skinner's loan, however, Citigroup began demanding that Mr. Skinner purchase flood insurance, despite LandSafe's prior determination that he was not in a flood zone that necessitated flood insurance.

34.     On January 9, 2012, CitiMortgage sent Mr. Skinner a letter indicating that it had determined that his property is in flood zone "A9" and that flood insurance is required.  *See* Exhibit 3.

35.     When Mr. Skinner subsequently sought to prove to Citigroup that its flood determination was incorrect, Citigroup failed to accept LandSafe's independent flood determination that had been accepted at closing.

### *Citigroup Force-Places Excessive Flood Insurance Coverage on Mr. Skinner*

36.     Even assuming that LandSafe's initial determination was inaccurate and that Mr. Skinner's property is located in an SFHA, the applicable flood insurance requirement is set by federal law and Fannie Mae.  As noted above, both federal law and Fannie Mae (the current owner of Mr. Skinner's loan) only require that flood insurance be at least **the lesser of**: (1) the outstanding principal balance; or (2) replacement cost up to the maximum amount of flood insurance available under the NFIP ($250,000).  However, Citigroup sought to impose a different (and more onerous) requirement on Skinner.

37.     On January 21, 2012, CitiMortgage sent Mr. Skinner a letter entitled "Notice of Flood Insurance."  *See* Exhibit 4.  In this letter, CitiMortgage informed Mr. Skinner that he was required to obtain $250,000 in flood insurance coverage, despite the fact that Mr. Skinner's outstanding principal balance was only $142,000.  In addition, the letter stated that Citigroup's flood coverage requirement was at least **the greater of**:

- 80% of the replacement value of your property, as represented by your hazard policy coverage amount; or

- The unpaid principal balance of all liens on your property;
  - However, the resulting coverage may not exceed 100% of the replacement value of your property or the maximum amount of coverage available through the National Flood Insurance Program (NFIP) of $250,000.

38.    CitiMortgage's January 21, 2012 letter further stated that "we have calculated the minimum required coverage based upon the amount of flood insurance required when you closed your loan…." As demonstrated above, however, Mr. Skinner was not required to have any flood insurance when he closed on his loan, so CitiMortgage's letter was false, deceptive, and misleading.

39.    On February 4, 2012, CitiMortgage sent Mr. Skinner a letter of force-placement stating that Citigroup had force-placed flood coverage of $250,000 through American Security Insurance Company ("ASIC") at an annual premium of $2,250.00. *See* Exhibit 5.

40.    Mr. Skinner continued to attempt to contact Citigroup after receiving the February 4, 2012 letter to prove that insurance was not required, but Citigroup has refused to refund the charge it unilaterally imposed for the force-placed flood coverage. Citigroup has even gone so far as to threaten foreclosure on Mr. Skinner's property (*see* Exhibit 6), even though Mr. Skinner has an exemplary payment history and has timely paid all regular monthly payments as required. The only amount "outstanding" is the amount that Citigroup is forcibly extracting from Mr. Skinner for the unnecessary flood insurance, which is causing Mr. Skinner's mortgage to falsely appear as though it is in arrears.

### *History of Plaintiff Casey's Mortgage Loan*

41.    On or about July 16, 2002, Mr. Casey obtained an FHA loan from HCI Mortgage ("HCI") for approximately $25,000, secured by a mortgage on his home. *See* Exhibit 7.

42.     Citibank acquired Mr. Casey's mortgage loan from HCI shortly thereafter.  From 2002 to 2011, Citibank was the lender-in-interest to Mr. Casey's mortgage, and during this time, CitiMortgage serviced Mr. Casey's mortgage loan on behalf of Citibank.

43.     In or around late 2011, Citibank transferred its interest in Mr. Casey's mortgage to Midland, and since then, Midland has been the lender-in-interest to the mortgage and has serviced Mr. Casey's loan.

44.     The current principal balance of Mr. Casey's mortgage loan is less than $17,000.

## *Flood Insurance Requirements for Mr. Casey's Residence*

45.     Because Mr. Casey's home falls within a SFHA, his mortgage loan is subject to the requirements of the NFIA and he must maintain flood insurance "in an amount at least equal to the outstanding principal balance of the loan or the maximum limit of coverage made available under the Act, ***whichever is less***."  42 U.S.C. § 4012a(b)(1) (emphasis added).

46.     Mr. Casey's mortgage does not require him to maintain flood insurance on his home in excess of the minimum amount required by federal law (*i.e.*, in excess of his principal balance).  Paragraph 4 of Mr. Casey's mortgage states that he is obligated to "insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary" of HUD.[4]  *See* Exhibit 7, ¶ 7.  HUD's website, in turn, provides as follows:

---

[4] This is the only provision of the mortgage that addresses flood insurance.  Although Paragraph 4 contains a separate provision relating to the amount of hazard insurance that is required as a condition of the loan, flood insurance is different from hazard insurance.  For this reason, many of the documents that Mr. Casey signed upon origination of his mortgage loan – including his HUD-1 Settlement Statement, Federal Truth-In-Lending Disclosure Statement, and Initial Escrow Account Disclosure Statement – refer separately to flood insurance and  hazard insurance.  *See* Exhibits 8-10.

> **Dollar Amount of Flood Insurance Coverage.** For loans, loan insurance or guarantees, the amount of flood insurance coverage need not exceed the outstanding principal balance of the loan.

http://www.hud.gov/offices/cpd/environment/review/floodinsurance.cfm (last visited July 20, 2012); *accord*, 24 C.F.R. § 203.16a(c) ("flood insurance must be maintained . . . in an amount at least equal to . . . the outstanding balance of the mortgage").

### *Citigroup Force-Places Excessive Flood Insurance Coverage on Mr. Casey*

47.    Pursuant to federal law and the terms of his mortgage, Mr. Casey obtained $25,000 in flood insurance coverage upon originating his mortgage loan.  *See* Exhibit 11.  This amount was deemed adequate by HCI as the original lender-in-interest, and was deemed adequate by Citigroup at the time Citigroup acquired Mr. Casey's loan.

48.    For years, Mr. Casey continued to maintain flood insurance on his home in an amount sufficient to cover his outstanding principal balance, and even increased his flood insurance coverage slightly over time.  Prior to 2010, Citigroup never contended that his coverage was inadequate.

49.    For the period from July 13, 2009 to July 13, 2010, Mr. Casey maintained $30,300 in flood insurance coverage on his home.  *See* Exhibit 12.  This amount was more than sufficient to cover his outstanding principal balance.

50.    On June 23, 2010, however, CitiMortgage sent Mr. Casey a form letter on behalf of Citibank ("First CitiMortgage Letter"), suddenly claiming that his flood insurance coverage was "deficient."  *See* Exhibit 13.

51.    According to the First CitiMortgage Letter, Mr. Casey was required to carry flood insurance coverage at least equal to the ***greater of*** 80% of the replacement cost value of his property or the unpaid principal balance of all liens on his property, up to $250,000.  This so-

called requirement (which is identical to the requirement imposed on Mr. Skinner) is not specified anywhere in Mr. Casey's mortgage or other loan documents.

52.     Based on this so-called requirement, CitiMortgage contended that Mr. Casey was required to increase his flood insurance coverage by $107,780.[5]  The First CitiMortgage Letter further stated that if Mr. Casey did not increase his flood insurance coverage by this amount, CitiMortgage would purchase a flood insurance policy for him and charge the premiums to his escrow account.

53.     On August 7, 2010, CitiMortgage sent Casey a second form letter on behalf of Citibank ("Second CitiMortgage Letter"), claiming that "your current flood policy is less than the amount of flood insurance required."  *See* Exhibit 14.  The Second CitiMortgage Letter further indicated that CitiMortgage had obtained a flood insurance binder for Mr. Casey's property in the amount of the alleged deficiency.

54.     On August 20, 2010, CitiMortgage sent Mr. Casey a third form letter on behalf of Citibank ("Third CitiMortgage Letter") informing him that CitiMortgage had purchased a one-year flood insurance policy for his property from ASIC.  *See* Exhibit 15.

55.     This force-placed flood insurance policy provided an additional $107,780 in flood insurance coverage for Mr. Casey's property at an annual premium cost of $970 that was paid out of his escrow account.  This was purely excess coverage,[6] and was totally unnecessary to protect Citigroup's financial interests because its financial stake in Mr. Casey's property was

---

[5] CitiMortgage contended that this amount was the "difference between the amount of [Mr. Casey's] existing flood insurance and the minimum acceptable coverage amount." *Id.*  As noted above, however, Mr. Casey's existing coverage amount already exceeded the level of coverage specified by the NFIA, HUD, and the terms of his mortgage.

[6] The Third CitiMortgage letter explicitly states that "coverage under this policy will only apply if a loss exceeds the amount of coverage provided by your existing insurance policy."

already fully protected by Mr. Casey's existing flood insurance policy, which listed CitiMortgage as an insured mortgagee. CitiMortgage unilaterally purchased this excess coverage without Mr. Casey's consent, and he did not want this coverage.

56.     In July 2011, Mr. Casey increased his flood insurance coverage level to $188,300, to satisfy Citigroup's flood insurance requirements and avoid being charged for another force-placed policy.[7]  *See* Exhibit 16.  At that point, CitiMortgage cancelled his force-placed coverage effective July 13, 2011, but refused to refund charges for force-placed coverage prior to that date.

57.     Plaintiff has never filed any claims on the lender-placed policy (or any other flood insurance policy), and his mortgage payments increased significantly after the force-placed premium was built into the monthly payment amounts.  This imposed a significant financial burden on Mr. Casey.[8]

58.     Mr. Casey has made the increased payments in full, in order to avoid damaging his credit or jeopardizing his ability to remain in his home.

### *Citigroup Receives a Kickback on Force-Placed Flood Insurance Policies*

59.     Citigroup and/or its affiliates received a kickback or commission from ASIC or ASIC's parent company (Assurant, Inc.) on the excessive lender-placed coverage that was charged to Plaintiffs.  Although this commission arrangement was kept secret from Plaintiffs and was not disclosed to them in any of the form letters they received, the commissions paid by ASIC or ASIC's parent company to lenders and/or their affiliates on force-placed insurance coverage are the subject of numerous reported cases.  *See, e.g., McNeary-Calloway v. JP*

---

[7] But for Citigroup's excessive insurance demands, Plaintiff would not have obtained this additional coverage and would not have incurred the cost of this additional coverage.

[8] Mr. Casey is a disabled former factory worker and lives with his wife on a fixed monthly disability check.

*Morgan Chase Bank, N.A.*, No. C-11-03058 JCS, 2012 WL 1029502, at *23 (N.D. Cal. Mar. 26, 2012); *Hofstetter v. Chase Home Fin. LLC,* No. 10-1313, 2011 WL 1225900 (N.D. Cal. Mar. 31, 2011); *Gipson v. Fleet Mortgage Group*, 232 F. Supp. 2d 691, 705-06 (S.D. Miss. 2002).

60.     These commission arrangements are also the subject of publicly-filed deposition testimony.   For example, in *Hofstetter*, Chase's representative testified that it is "a standard industry-wide practice" for a mortgage lender to be paid a commission by the insurance provider in connection with lender-placed flood insurance.  *See* Exhibit 17 at 67:5-14.[9]   Like Citigroup, Chase procures its force-placed flood insurance coverage through ASIC.  *Id.* at 68:16-69:14.

61.     Moreover, the commission arrangements between major banks and insurance firms -- including ASIC's parent company, Assurant, Inc. -- have been reported in *American Banker* magazine (*see* Exhibit 18), and are the subject of a pending investigation by the New York Department of Financial Services ("NYDFS"), which has "uncovered evidence of potentially problematic and abusive practices in the industry occurring at the expense of homeowners[.]"  *See* http://www.dfs.ny.gov/about/press/pr1204261.htm.   "Early findings of the investigation suggest that 15 percent or more of premiums collected by force-placed insurers flow to the banks through insurance agents affiliated with the banks."   *See* www.dfs.ny.gov/about/press/pr1204051.htm.[10]

---

[9] Shortly after the deposition testimony in *Hofstetter* became public (in March 2011), Chase entered into a multi-million dollar settlement (in July 2011), under which it agreed to disgorge 100% of the commissions that it received on force-placed flood insurance for eligible class members, and permanently refrain from accepting commissions in connection with force-placed flood insurance for HELOC borrowers.  Following notice to the class members, that settlement received final approval from court on November 14, 2011.

[10] CitiMortgage was one of the entities subpoenaed by the NYDFS, in addition to ASIC and Assurant.  *See* Exhibit 19.

62.     The kickback arrangements between ASIC and its lender-partners are unquestionably unjust.

63.     Numerous courts have condemned this type of self-dealing in connection with force-placed insurance.  *See, e.g.*, *McNeary-Calloway*, 2012 WL 1029502, at *23-29; *Williams*, 2011 WL 4901346, at *2, 4; *Abels v. JPMorgan Chase Bank, N.A.*, 678 F. Supp. 2d 1273, 1278–79 (S.D. Fla. 2009); *Gipson*, 232 F. Supp. 2d. at 707; *Stevens v. Citigroup, Inc.*, No. CIV.A 00-3815, 2000 WL 1848593, at *1, 3 (E.D. Pa. Dec. 15, 2000).

64.     Moreover, the practice of accepting commissions in connection with force-placed flood insurance is inconsistent with the NFIA, which only allows lenders and servicers to "charge the borrower for the cost of premiums and fees *incurred* by the lender or servicer for the loan in purchasing the insurance."  42 U.S.C. § 4012(e)(2) (emphasis added); *see also* 12 C.F.R. § 22.3.

65.     HUD also forbids such kickbacks and commissions in its Lender Guide, HUD 4155.2.  *See* Exhibit 20.  HUD's Lender Guide expressly states that "[a]dvancing funds in anticipation of commissions on sales being financed with FHA-insured mortgages is prohibited." *Id.*  In addition, the Lender Guide states that "[a] lender is *not* permitted to pay any fee, compensation, or thing of value other than for services actually performed, including kick back fees[.]" *Id.*

66.     In addition, Fannie Mae prohibits these type of kickback and commission arrangements.  On March 14, 2012, Fannie Mae issued a Servicing Guide Announcement ("SGA") pertaining to lender-paced insurance.  *See* Exhibit 21.  In the SGA, Fannie Mae clarified its requirements relating to reasonable reimbursable expenses for lender-placed insurance, and stated that "reimbursement of lender-placed insurance premiums must **exclude**

any lender-placed insurance commission earned on that policy by the servicer or any related entity[.]"  *Id.* at 4 (emphasis in original).

67.     Earlier that same month, on March 6, 2012, Fannie Mae issued a Request for Proposal ("RFP") relating to lender-placed insurance.  *See* Exhibit 22.[11]  In the RFP, Fannie Mae stated that it had conducted an "extensive internal review" of the lender-placed insurance process, and found that the process "can be improved through unit price reductions and fee transparency to the benefit of both the taxpayers and homeowners."  *Id.* at 2.  In particular, Fannie Mae made the following observations:

- "Lender Placed Insurers often pay commissions/fees to Servicers for placing business with them.  The cost of such commissions/fees is recovered in part or in whole by the Lender Placed Insurer from the premiums[.]"

- "The existing system may encourage Servicers to purchase Lender Placed Insurance from Providers that pay high commissions/fees to the Servicers and provide tracking, rather than those that offer the best pricing and terms . . . . Thus, the Lender Placed Insurers and Servicers have little incentive to hold premium costs down."

- "[M]uch of the current lender placed insurance cost borne by Fannie Mae results from an incentive arrangement between Lender Placed Insurers and Servicers that disadvantages Fannie Mae and the homeowner."

*Id.*  Thus, Fannie Mae sought to "[r]estructure the business model to align Servicer incentives with the best interest of Fannie Mae and homeowners."  *Id. at 3.*  Among other things, Fannie Mae sought to "[e]liminate the ability of Servicers to pass on the cost of commissions/fees to Fannie Mae" and "[s]eparate the commissions and fees for Insurance Tracking Services from the fees for Lender Placed Insurance to ensure transparency and accountability."  *Id.* at 2.

---

[11]  The RFP was labeled "Confidential" by Fannie Mae, but subsequently was published in *American Banker* magazine.  *See* Jeff Horwitz, Fannie Mae Seeks to Break up Force-Placed Market, Document Shows, AMERICAN BANKER, May 24, 2012, *available at* www.americanbanker.com/issues/177_101/fannie-rfp-gse-contracting-document-1049630-1.html.

68.     Two months later, the "NYDFS held three days of public hearings in May 2012 regarding the force-placed insurance practices of several mortgage lenders, servicers, and insurance companies.   *See* http://www.dfs.ny.gov/insurance/hearing/fp_052012_schedule.htm. On the opening day of the hearings, NYDFS Superintendent Benjamin Lawsky issued a statement announcing that "our initial inquiry into the operation of the force placed insurance market has raised a number of serious concerns and red flags."  *See* Exhibit 23 at 2.  Among other things, Superintendent Lawsky noted that:

> there . . . appears to be a web of tight relationships between the banks, their subsidiaries and insurers that have the potential to undermine normal market incentives and may contribute to other problematic practices.  In some cases this takes the form of large commissions being paid by insurers to the banks for what appears to be very little work.

*Id.*  Superintendent Lawsky further stated that "[t]his perverse incentive, if it exists, would appear to harm both homeowners and investors while enriching the banks and the insurance companies."  *Id.* at 3.   Following these hearings, the NYDFS asked lender-placed insurance companies in New York (including ASIC) to submit new rate filings.

69.     These concerns are by no means limited to regulators in New York.  In fact, the National Association of Insurance Commissioners ("NAIC") recently expressed similar "regulatory concern":

> A key regulatory concern with the growing use of lender-placed insurance is "reverse competition," where the lender chooses the coverage provider and amounts, yet the consumer is obligated to pay the cost of coverage. Reverse competition is a market condition that tends to drive up prices to the consumers, as the lender is not motivated to select the lowest price for coverage since the cost is born by the borrower. Normally competitive forces tend to drive down costs for consumers. However, in this case, the lender is motivated to select coverage from an insurer looking out for the lender's interest rather than the borrower.

Exhibit 24.  As a result, the NAIC announced that it will hold its own public hearing relating to force-placed insurance on August 9, 2012.  *Id.*

***Midland Mortgage Force-Places More Excessive Flood Insurance Coverage on Mr. Casey
and Receives Its Own Kickback through FirstInsure***

70.     Shortly after imposing increased flood insurance requirements on Mr. Casey,
Citibank transferred his mortgage to Midland, which demanded even more flood insurance
coverage for the property.

71.     Specifically, on December 23, 2011, Midland sent Mr. Casey a Notice of
Insufficient Flood Insurance Coverage ("First Midland Letter") claiming that "[a] review of your
flood insurance coverage indicates that your property is not adequately insured in the event of a
loss."  *See* Exhibit 25.

72.     In this letter, Midland acknowledged that Mr. Casey was not obligated "[b]y law"
to maintain flood insurance in excess of his outstanding principal balance, but stated that
Midland requires "100-percent Replacement Cost Value" coverage, up to the National Flood
Insurance Program maximum of $250,000.  Based on this purported requirement, which is not
contained in Mr. Casey's mortgage or other loan documents, Midland determined that "the
minimum required flood coverage for [Plaintiff's] property should be $237,349."

73.     This coverage amount was approximately ***fourteen times*** Mr. Casey's outstanding
principal balance, and was not required as a condition of his loan.  Nevertheless, Midland stated
that it would purchase additional flood insurance coverage for Mr. Casey's property if he did not
meet this new requirement.

74.     On January 23, 2012, Midland sent Mr. Casey a Second Notice of Insufficient
Flood Insurance Coverage ("Second Midland Letter").  *See* Exhibit 26.  In this letter, Midland
claimed that "[t]here is a problem with the FLOOD insurance on your home[,]" and demanded
that Mr. Casey increase his flood coverage amount to $237,349 within fifteen days.

75.     On February 9, 2011, Midland sent Casey a Notice of Purchase of Lender Placed Flood Policy Due to Insufficient Coverage Amount ("Third Midland Letter").  *See* Exhibit 27. In this form letter, Midland announced that it had purchased $49,049 in additional flood insurance coverage for Mr. Casey's property -- beyond his existing coverage level of $188,300 -- but also curiously stated that "the minimum flood coverage for your property should be $0."

76.     The cost of this force-placed flood insurance coverage ($154.12) was charged to Mr. Casey's mortgage escrow account and built into his monthly mortgage payment.  As a result of this force-placed flood insurance coverage and the increased coverage that Mr. Casey already had obtained (which also was paid out of his escrow account), he is now paying $1,478.12 per year in flood insurance on his mortgage loan, and his monthly payments have skyrocketed to $757.30 to make up for the resulting escrow "shortage."  *See* Exhibit 28.

77.     This unwarranted, unnecessary, and excessive flood insurance has placed a crushing financial burden on Mr. Casey, and he has barely managed to make the increased monthly payment amount that became effective in May 2012.  Unless Midland changes its policy or is ordered to do so, it is likely that Mr. Casey will be unable to continue making these increased payments and may lose his home.

78.     Mr. Casey's predicament recently was the subject of a lengthy investigative article in the Syracuse Post-Standard.  *See* Exhibit 29.  In this article, a Midland spokesperson declined to budge from Midland's onerous flood insurance requirement, stating that Midland insists on replacement cost coverage "to ensure that if the property sustained a total loss that our interests would be protected and the property rebuilt."

79.     This explanation defies common sense.  Midland's financial interest in Mr. Casey's property is limited to recovering his outstanding principal balance, and Midland has no

right whatsoever to demand additional flood insurance coverage in excess of the amount required by the NFIA, HUD, or the terms of Mr. Casey's mortgage.

80.     Midland did not force-place additional flood insurance coverage on Mr. Casey's property to protect its legitimate financial interests, or out of concern for Casey.  Rather, Midland force-placed this increased flood insurance coverage because it was financially lucrative for it to do so.  Midland's form letters expressly acknowledge that "[a]n affiliate of Midland, FirstInsure, earns a commission on, and/or derives other income from, premiums from lender placed flood insurance."

## CLASS ACTION ALLEGATIONS

81.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

### *Proposed Classes Regarding Citigroup*

82.     Plaintiffs assert their breach of contract/breach of covenant of good faith and fair dealing claim against Citigroup (Count 1) and Plaintiff Skinner asserts his TILA claim against Citigroup (Count 6) on behalf of a proposed Citigroup Over-Insured Class defined as follows:

> **Proposed Citigroup Over-Insured Class:**   All persons with residential mortgages originated, acquired and/or serviced by any Citigroup Defendant and who, within the applicable statutes of limitations, were forced by any Citigroup Defendant to pay for flood insurance which exceeded the lesser of the following: (1) $250,000; (2) the replacement cost value of the property pledged as security for the loan; or (3) the total outstanding loan balance, but excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and employees.

83.     Plaintiffs assert their unjust enrichment claim against Citigroup (Count 2) on

behalf of a proposed Citigroup Lender-Placed Class defined as follows:[12]

> **Proposed Citigroup Lender-Placed Class:**   All persons in the United
> States who were charged for lender-placed flood insurance by Citigroup
> during the applicable limitations period.

84.     Plaintiffs assert their breach of fiduciary duty/breach of trust claims (Count 3) and

conversion claims (Count 4) against Citigroup on behalf of a proposed Citigroup Escrow

Subclass defined as follows:

> **Proposed Citigroup Escrow Sub-Class:**   All persons in the Citigroup
> Over-Insured Class or Lender-Placed Class whose lender placed insurance
> premiums were escrowed by Citigroup.

85.     Plaintiff Casey asserts his NYDPA claim against Citigroup (Count 5) on behalf of

a proposed Citigroup New York Subclass defined as follows:

> **Proposed Citigroup New York Subclass:**   All persons in the Citigroup
> Over-Insured Class or the Citigroup Lender-Placed Class whose mortgage
> loan or line of credit with Citigroup was secured by real property in the
> State of New York, and who were subject to Citigroup's flood insurance
> requirements and/or had lender-placed flood insurance coverage
> purchased for their property by Citigroup on or after May 17, 2009.

***Proposed Classes Regarding Midland***

86.     Plaintiff Casey asserts his breach of contract/breach of covenant of good faith and

fair dealing claim against Midland (Count 7) and TILA claim against Midland (Count 12) on

behalf of a proposed Midland Over-Insured Class defined as follows:

> **Proposed Midland Over-Insured Class:**   All persons with residential
> mortgages originated, acquired and/or serviced by Midland and who,
> within the applicable statutes of limitations, were forced by any Defendant
> to pay for flood insurance which exceeded the lesser of the following:  (1)
> $250,000; (2) the replacement cost value of the property pledged as

---

[12] To the extent that Plaintiffs' claim in Count One is based on allegations of unlawful kickbacks
or commissions, this claim is also asserted on behalf of the proposed Citigroup Lender-Placed
Class.  Plaintiffs plead breach of contract and unjust enrichment as alternative theories.

security for the loan; or (3) the total outstanding loan balance, but excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and employees

87.     Plaintiff Casey asserts his unjust enrichment claim against Midland and FirstInsure (Count 8) on behalf of a proposed Midland Lender-Placed Class defined as follows:[13]

> **Proposed Midland Lender-Placed Class:**  All persons in the United States who were charged for lender-placed flood insurance by Midland during the applicable limitations period.

88.     Plaintiff Casey asserts his breach of fiduciary duty/breach of trust claim against Midland (Count 9) and conversion claim against Midland (Count 10) on behalf of a proposed Midland Escrow Subclass defined as follows:

> **Proposed Midland Escrow Sub-Class:**  All persons in the Midland Over-Insured Class or the Lender-Placed Class whose lender placed insurance premiums were escrowed by Midland.

89.     Plaintiff Casey asserts his NYDPA claim against Midland (Count 11) on behalf of a proposed Midland New York Subclass defined as follows:

> **Proposed Midland New York Sub-Class:**  All persons in the Midland Over-Insured Class or the Midland Lender-Placed Class whose mortgage loan or line of credit with Midland was secured by real property in the State of New York, and who were subject to Midland's flood insurance requirements and/or had lender-placed flood insurance coverage purchased for their property by Midland on or after May 17, 2009.

90.     The defined Classes and Subclasses set forth above are collective referred to herein as the "Classes."

---

[13] To the extent that Casey's claim in Count Seven is based on allegations of unlawful kickbacks or commissions, this claim is also asserted on behalf of the proposed Midland Lender-Placed Class.  Casey pleads breach of contract and unjust enrichment as alternative theories.

91.     <u>Numerosity</u>:   The Classes are so numerous that joinder of all Class members is impracticable.  During the relevant time period, thousands of Defendants' customers satisfy the definition of the proposed Classes.

92.     <u>Typicality</u>:    Plaintiffs' claims are typical of the claims of members of the Classes.  Among other things: (1) Plaintiffs' mortgage documents are typical of those of other Class members in that Plaintiff Casey and Plaintiff Skinner have typical FHA and Fannie Mae/Freddie Mac form mortgages used without substantial difference throughout the United States; (2) the form letters that Plaintiffs received are typical of those form letters received by the other Class members; (3) Defendants treated Plaintiffs consistent with other Class members in accordance with Defendants' uniform policies and practices; (4) it was typical for Defendants to require mortgagors to purchase and maintain flood insurance coverage in amounts greater than required by law, greater than required by their mortgage documents, and greater than required to insure the amount of funds extended to them; and (5) it was typical for Defendants and/or their affiliates to receive kickbacks, commissions or other compensation in connection with lender-placed insurance.

93.     <u>Adequacy</u>:    Plaintiffs will fairly and adequately protect the interests of the Classes, and have retained counsel experienced in complex class action litigation, including flood insurance litigation.  *See, e.g.*, *Hofstetter v. Chase Home Finance, LLC*, No. 10-01313, 2011 WL 1225900 (N.D. Cal. Mar. 31, 2011) (finding counsel of record to be adequate and appointing counsel as class counsel in class action lawsuit asserting similar claims).

94.     <u>Commonality</u>:  Common questions of law and fact exist as to the members of the Classes and predominate over any questions solely affecting individual members of the Classes, including, without limitation:

a.      whether federal law requires Defendants' customers in SFHAs to purchase and/or maintain flood insurance in amounts greater than their outstanding principal balance;

b.      whether HUD requires Defendants' customers in SFHAs to purchase and/or maintain flood insurance in amounts greater than their outstanding principal balance;

c.      whether Fannie Mae/Freddie Mac require Defendants' customers in SFHAs to purchase and/or maintain flood insurance in amounts greater than their outstanding principal balance;

d.      whether Defendants have a pervasive policy and practice of requiring unreasonable amounts of flood insurance in excess of federal requirements, HUD requirements and Fannie Mae/Freddie Mac guidelines;

e.      whether Defendants' form letters are false, deceptive, and/or misleading;

f.      whether the mortgage documents relied upon by Defendants authorize Defendants to demand and/or force-place flood insurance in amounts greater than necessary to secure the amount of funds extended;

g.      whether Defendants breached their mortgage agreements with borrowers by demanding unauthorized amounts of flood insurance or amounts that were not properly and adequately disclosed upon origination of such borrowers' loans or home equity credit lines;

h.      whether Defendants owe their customers a duty of good faith and fair dealing, and if so, whether Defendants breached this duty by, *inter alia*, (1) demanding flood insurance in amounts greater than necessary to secure the amount of funds extended and greater than required by federal law, HUD, or Fannie Mae/Freddie Mac; and (2) arranging for kickbacks or commissions for themselves and/or their affiliates in connection with force-placed insurance;

i.      whether Defendants owe their customers a fiduciary duty in connection with mortgage escrow accounts, and if so, whether Defendants breached this duty by, *inter alia*, (1) paying for excessive amounts of flood insurance coverage out of escrow; and (2) arranging for kickbacks or commissions for themselves and/or their affiliates in connection with force-placed insurance purchased out of escrow;

j.      whether Defendants were unjustly enriched by their conduct;

k.      whether Defendants conduct as described herein violates the NYDPA;

l.      whether Defendants conduct as described herein violates the TILA;

m.      the appropriateness and proper form of any declaratory or injunctive relief;

n.      the appropriateness and proper measure of monetary and other damages sustained by the Classes; and

o.      the appropriateness and proper measure of statutory penalties and punitive damages.

95.    This case is maintainable as a class action under Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Classes, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Classes as a whole.

96.    Class certification is also appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Defendants' conduct described in this Complaint stems from common and uniform policies and practices, resulting in unnecessary flood insurance premiums and related charges that are readily calculable from

Defendants' business records and other class-wide evidence.  Members of the Classes do not have an interest in pursuing separate individual actions against Defendants, as the amount of each Class member's individual claims is small compared to the expense and burden of individual prosecution.  Class certification also will obviate the need for unduly duplicative litigation that may result in inconsistent judgments concerning Defendants' practices.  Moreover, management of this action as a class action will not present any likely difficulties.   In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all Class members' claims in a single forum.

97.     Plaintiffs intend to send notice to all members of the Classes to the extent required by Rule 23 and with the approval of the Court.  The names and addresses of the Class members are available from Defendants' records.

## FIRST CLAIM FOR RELIEF
### BREACH OF CONTRACT / BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING
### (Asserted against Citigroup by Plaintiffs Casey and Skinner)

98.     Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

99.     Plaintiff Casey's mortgage is a standard form FHA mortgage.

100.     Citibank was the lender-in-interest to Plaintiff Casey's mortgage from 2002 (after the mortgage was acquired by Citibank) until Citibank transferred its interest in the mortgage to Midland in the second half of 2011.  During this time, CitiMortgage serviced the mortgage on behalf of Citibank.

101.     Citigroup was bound by the terms of Plaintiff Casey's mortgage during the time that it held and serviced the mortgage.  Citigroup was without power to set or change the flood insurance requirements of Plaintiff Casey's mortgage in a manner inconsistent with HUD's

requirements, as the mortgage provides for insurance "against loss by floods to the extent required by the Secretary" of HUD.  *See Exhibit 7, ¶ 4.*

102.   Plaintiff Skinner's mortgage is a standard Fannie Mae/Freddie Mac form mortgage.  Citigroup was without power to set or change the flood insurance requirements of Plaintiff Skinner's mortgage in a manner inconsistent with Fannie Mae's requirements since Fannie Mae owns the loan and is the "Lender" as referred to in Plaintiff Skinner's mortgage contract, and its flood insurance requirements are controlling (and not those based on the individual corporate policies of the servicing entity).

103.   Plaintiffs' mortgages do not require flood insurance coverage in an amount greater than the amount of the outstanding principal balance.

104.   Citigroup breached the terms of Plaintiffs' mortgages by requiring Plaintiffs to obtain and maintain flood insurance in excess of the amount required under the mortgages, and by force-placing flood insurance in excess of the amount required under the mortgages.

105.   Citigroup also breached the terms of Plaintiffs' mortgages by accepting commissions or kickbacks in connection with force-placed flood insurance.

106.   Plaintiff Casey's mortgage provides that "Lender may collect fees and charges authorized by the Secretary" of HUD.  *See Exhibit 7, ¶ 8.*  Kickbacks or commissions in connection with force-placed insurance are not authorized by HUD.  *See Exhibit 20.*

107.   Plaintiff Skinner's mortgage provides that "Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the property and rights under this Security Instrument[.]"  *See Exhibit 7, ¶ 9.*  This language does not authorize Citigroup to arrange for kickbacks or commissions for itself or its affiliates in connection with lender-placed

insurance.  Payment of kickbacks or commissions to a loan servicer is neither appropriate nor necessary to protect the lender's legitimate interests or rights.

108.   The foregoing breaches were not isolated.  Citigroup similarly breached the mortgage agreements of other Citigroup Class members by requiring them to obtain and maintain flood insurance in excess of the amount required under their mortgage agreements, by force-placing flood insurance in excess of the amount required under their mortgage agreements, and or by accepting kickbacks or commissions in connection with force-placed flood insurance.

109.   Citigroup also breached the implied covenant of good faith and fair dealing inherent in Plaintiffs' mortgages and the mortgages of other Citigroup Class members.

110.   Citigroup owed Plaintiffs and the Citigroup Class members a duty of good faith and fair dealing, by virtue of Citigroup's contractual relationship with Plaintiffs and the Class members.

111.   Citigroup breached this duty by, among other things: (1) demanding and/or force-placing flood insurance coverage in excess of the amount required by federal law and/or the relevant mortgage documents, and in excess of the amount required to protect Citigroup's legitimate financial interests; (2) unreasonably exercising in bad faith any purported discretionary authority Citigroup claims it was afforded under the loan and mortgage documents, (3) imposing contractual requirements that did not exist or that exceeded the requirements disclosed in the relevant loan and mortgage documents; and (4) arranging for kickbacks, commissions, or other compensation for itself and/or its affiliates in connection with lender-placed insurance.

112.   Citigroup willfully engaged in the foregoing conduct in bad faith, for the purpose of: (1) gaining unwarranted contractual and legal advantages; (2) unfairly and unconscionably

maximizing revenue from Plaintiffs and other Class members; and (3) generating commissions, kickbacks, or other compensation for Citigroup and/or its affiliates.

113.    The foregoing breaches were willful and not the result of mistake or inadvertence. Citigroup systematically and pervasively required Plaintiffs and other Citigroup Class Members to obtain flood insurance in excess of the amount required under their mortgage documents, in excess of the amount required by federal law, and in excess of the amount that Citigroup could fairly and reasonably demand in good faith.   Citigroup also pervasively arranged for commissions for itself and/or its affiliates in connection with lender-placed flood insurance.

114.    As a direct result of Citigroup's breaches of contract and breaches of the implied covenant of good faith and fair dealing, Plaintiffs and the Citigroup Class members have been injured, and have suffered actual damages and monetary losses, in the form of increased insurance premiums, interest payments, and/or other fees and charges.

115.    Plaintiffs and the Citigroup Class members are entitled to recover their damages and other appropriate relief for the foregoing contractual breaches.

**SECOND CLAIM FOR RELIEF**

**UNJUST ENRICHMENT**

**(Asserted against Citigroup by Plaintiffs Casey and Skinner)**

116.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

117.    Citigroup has been unjustly enriched as a result of the conduct described in this Complaint and other inequitable conduct.

118.    Citigroup received a benefit from Plaintiffs and other Citigroup Lender-Placed Class members in the form of payment for force-placed flood insurance, and Citigroup and/or its affiliates retained a portion of these payments as commissions or other compensation.

119.     Retention of these payments by Citigroup would be unjust and inequitable.  The NFIA only allows lenders and servicers to "charge the borrower for the cost of premiums and fees incurred by the lender or servicer for the loan in purchasing the insurance." 42 U.S.C. § 4012(e)(2); *see also* 12 C.F.R. § 22.3.   Moreover, HUD prohibits kickback or commission arrangements in its Lender's Manual, and these types of kickbacks or commissions are also prohibited by Fannie Mae.   For these reasons and the other reasons set forth above, Citigroup abused its discretion to pass through costs for force-placed flood insurance, by charging Plaintiffs and other Citigroup Lender-Placed Class members amounts in excess of the net costs incurred by Citigroup for such insurance and by retaining at least a portion of the premium payments as kickbacks, commissions or other compensation.

120.     The kickbacks, commissions or other compensation that Citigroup and/or its affiliates received in connection with force-placed flood insurance were not legitimately earned, and came at the ultimate expense of Plaintiffs and members of the Citigroup Lender-Placed Class who had insurance force-placed on them by Citigroup.

121.     Because it would be unjust and inequitable for Citigroup and/or its affiliates to retain such payments through their manipulation of the force-placed insurance process, Plaintiffs and the Citigroup Lender-Placed Class are entitled to restitution of all monies unjustly and inequitably retained.   Citigroup cannot retain these payments in good conscience.

## THIRD CLAIM FOR RELIEF
### BREACH OF FIDUCIARY DUTY / BREACH OF TRUST
### (Asserted against Citigroup by Plaintiffs Casey and Skinner)

122.     Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

123.    Plaintiffs' mortgages contain escrow provisions.  In the FHA form mortgage, Paragraph 2 provides the relevant terms.  In the Fannie Mae/Freddie Mac mortgage, Paragraph 3 provides the relevant terms.  These terms are standard and typical of other mortgages originated and/or serviced by Citigroup.

124.    Paragraph 2 of Plaintiff Casey's mortgage provides that "Borrower shall include in each monthly payment . . . premiums for insurance[,]" including flood and hazard insurance.

125.    Paragraph 2 of Plaintiff Casey's Mortgage further provides that the sums included in his monthly payment for insurance premiums are to be held in escrow by his lender.  These funds are to be used for the purpose of paying his insurance premiums when due, and any excess funds are to be returned to Casey under the terms of his mortgage.

126.    Paragraph 3 of Plaintiff Skinner's mortgage states "Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the note is paid in full, a sum (the "Funds") to provide for payment of the amounts due for … premiums for any and all insurance required by the Lender under Section 5 [governing required property insurance]….  These items are called 'Escrow Items'….   Borrower shall pay Lender the Funds for Escrow Items…."  Paragraph 3 of Plaintiff Skinner's mortgage thus provides that the Funds for Escrow Items are to be held in escrow by his lender.

127.    Citigroup has accepted monies from Plaintiffs for insurance premiums on a monthly basis and has held them in escrow, pursuant to the mortgage agreements.

128.    Citigroup was obligated to hold these escrow funds in trust, and owed Plaintiffs a fiduciary duty with respect to the handling of such funds.

129.    Citigroup breached its fiduciary duty to Plaintiffs and other members of the Citigroup Escrow Subclass: (1) by unilaterally using escrow funds to purchase flood insurance

31

that Plaintiffs and other Subclass members did not want and were not required to obtain; and (2) by profiting from force-placed insurance policies that were purchased from escrow funds at the expense of Plaintiffs and other Subclass members.

130.    These actions were undertaken by Citigroup in bad faith for its own benefit and were not intended to benefit Plaintiffs or other borrowers.

131.    As a direct result of Citigroup's actions, Plaintiffs and the Citigroup Escrow Subclass have suffered injury in the form of unnecessary and excessive escrow charges, a loss of funds from their escrow accounts, increased mortgage payments due to alleged escrow "shortages," and related injuries.

132.    Plaintiffs and the Citigroup Escrow Subclass are entitled to damages for Citigroup's beaches of its fiduciary obligations and misappropriation of escrow funds.   In addition, Plaintiffs and the Citigroup Escrow Subclass are entitled to punitive damages because Citigroup acted in bad faith in deliberate and/or reckless disregard of their rights and its obligation to hold their escrow funds in trust.

### FOURTH CLAIM FOR RELIEF

**CONVERSION**

**(Asserted against Citigroup by Plaintiffs Casey and Skinner)**

133.    Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

134.    Citigroup had and continues to have a duty to maintain and preserve customers' mortgage accounts, and mortgage escrow accounts, and to prevent their diminishment or alteration through its own wrongful acts.

135.    Citigroup wrongfully and intentionally collected insurance premiums from customers' mortgage escrow accounts or added such payments to customers' mortgage accounts.

136.    Citigroup collected these premiums by wrongfully and intentionally withdrawing specific and readily identifiable funds from mortgage customers' escrow accounts or misappropriating funds paid to customers' account balances for their regular monthly mortgage payments in order to fund its force-placed insurance scheme.

137.    Citigroup has assumed and exercised the right of ownership over these funds without authorization to do so and in hostility to the rights of Plaintiffs and the Citigroup Escrow Subclass without legal justification.

138.    Citigroup has retained these funds unlawfully without the consent of Plaintiffs and the Citigroup Escrow Subclass and has deprived them from exercising control over the funds.

139.    Citigroup intends to permanently deprive Plaintiffs and the Citigroup Escrow Subclass of these funds.

140.    Plaintiffs and the Citigroup Escrow Subclass properly own these funds, not Citigroup, who now claims that it is entitled to ownership of the funds contrary to the rights of Plaintiffs and the Citigroup Escrow Subclass.

141.    Plaintiffs and the Citigroup Escrow Subclass are entitled to the immediate possession of these funds.

142.    Citigroup has wrongfully converted these specific and readily identifiable funds.

143.    Citigroup's wrongful conduct is of a continuing nature.

144.    As a direct and proximate result of Citigroup's wrongful conversion, Plaintiffs and the Citigroup Escrow Subclass have suffered and continue to suffer damages.  Plaintiffs and the Citigroup Escrow Subclass are entitled to recover from Citigroup all damages and costs

permitted, including all amounts that Citigroup wrongfully converted, which are specific and readily identifiable.

## **FIFTH CLAIM FOR RELIEF**

**VIOLATION OF NEW YORK DECEPTIVE PRACTICES ACT ("NYDPA")**
**N.Y. Gen. Bus. Law § 349, *et seq.***

**(Asserted against Citigroup by Plaintiff Casey)**

145.    Plaintiff Casey alleges and incorporates by reference the allegations in the preceding paragraphs.

146.    Citigroup was required to adhere to the requirements of the NYDPA when conducting business with Mr. Casey and other Citigroup New York Subclass members. Citigroup provided credit and related services to Mr. Casey and the members of the Citigroup New York Subclass for personal, family, and/or household purposes.

147.    The NYDPA provides that "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state are hereby declared unlawful."

148.    Citigroup pervasively violated the NYDPA during the relevant period, and continues to violate this statute, by virtue of the unfair, deceptive, and fraudulent practices described herein.

149.    Among other things, Citigroup violated the NYDPA by:

a)       illegitimately demanding and force-placing excessive and unnecessary flood insurance on property owned by  Mr. Casey and other Citigroup New York Subclass members, in amounts greater than required by law, greater than Citigroup's financial interest, and contrary to the amounts agreed upon in their borrower agreements;

b)      fraudulently and deceptively misrepresenting the amount of flood insurance that Mr. Casey and the other New York Subclass members are required to maintain under their mortgage agreements and/or federal law;

c)      materially misrepresenting to Mr. Casey and the Citigroup New York Subclass members that federal law and/or their mortgages conferred obligations on them that they did not have;

d)      unfairly and deceptively arranging for secret kickbacks, commissions, or other compensation for itself and/or its affiliates in connection with force-placed insurance purchased for Mr. Casey and other Citigroup New York Subclass members;

e)      deceptively charging Mr. Casey and other Citigroup New York Subclass Members amounts in excess of the net costs incurred for force-placed insurance; and

f)      engaging in other unconscionable and deceptive conduct as set forth in the Complaint.

150.    Citigroup engaged in such violations for the purpose of: (1) unfairly and unconscionably maximizing revenue from Mr. Casey and other Citigroup New York Subclass members; (2) generating commissions, kickbacks, or other compensation for Citigroup and/or its affiliates; (3) gaining unwarranted contractual and legal advantages; and (4) inducing and/or forcing Mr. Casey and other Citigroup New York Subclass members to procure unnecessary and/or excessive amounts of insurance.[14]

---

[14] Plaintiff Casey and the Citigroup New York Subclass reasonably and justifiably relied on Citigroup to (among other things) fully, honestly, and fairly disclose the amount of insurance that was required for their property under their mortgages and federal law, and to interpret and/or apply such requirements reasonably and fairly in good faith.

151.    Citigroup willfully engaged in such conduct and knew that it violated the NYDPA or showed reckless disregard for whether it violated the NYDPA.

152.    As a result of Citigroup's violations of the NYDPA, Mr. Casey and the Citigroup New York Subclass have been injured and have suffered actual damages and monetary losses in the form of increased insurance premiums, interest payments, and/or other fees and charges.

153.    Mr. Casey and the Citigroup New York Subclass members are entitled to actual damages, statutory damages, treble damages, injunctive relief, attorneys' fees and costs, and any other remedies available under the NYDPA or in equity, for Citigroup's violations of the NYDPA.  *See* N.Y. Gen. Bus. Law § 349(h).

**SIXTH CLAIM FOR RELIEF**

**VIOLATION OF THE TRUTH IN LENDING ACT**

**(15 U.S.C. § 1601, *et seq.*)**

**(Asserted against Citigroup by Plaintiff Skinner)**

154.    Plaintiff Skinner alleges and incorporates by reference the allegations in the preceding paragraphs.

155.    Residential mortgage loan agreements are subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq*., and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

156.    Citigroup is a "creditor" as defined by the TILA.

157.    Under the TILA, Citigroup is required to accurately and fully disclose the terms of the legal obligation between the parties.  *See* 12 C.F.R. § 226.17(c)(1) ("The disclosures shall reflect the terms of the legal obligation between the parties.").  This duty to make truthful and accurate disclosures is an ongoing duty, and applies to both subsequent disclosures and initial disclosures at the time of the loan transaction.  *See Hubbard v. Fidelity Fed. Bank*, 91 F.3d 75, 79 & n.7 (9th Cir. 1996) (rejecting defendant's argument that 12 C.F.R. § 226.17(c) "only

applies to disclosures before consummation of the transaction"); *Demando v. Morris*, 206 F.3d 1300, 1303 (9th Cir. 2000) ("Because the Notice contained terms that were in violation of the credit agreement, the Notice violated Regulation Z.").

158.    Citigroup violated TILA by misrepresenting to Mr. Skinner and other Citigroup Over-Insured Class members that they were required to purchase flood insurance in amounts greater than required under their mortgage agreements and greater than necessary to secure their outstanding principal balance.  *See Wulf v. Bank of Am., N.A.*, 798 F. Supp. 2d 586, 597-99 (E.D. Pa. June 27, 2011) ("*Wulf I*") (magistrate opinion) (denying motion to dismiss borrower's claims for violation of the TILA, based on "Defendant's departure from the mortgage documentation" by force-placing flood insurance in excess of the amount required by Plaintiff's mortgage); *accord, Gooden v. SunTrust Mortg., Inc.*, 2012 WL 996513, at *4-5 (E.D. Cal. Mar. 23, 2012) (finding Plaintiff stated valid TILA claim that Defendant force-placed unauthorized hazard insurance that exceeded the amount required in the loan agreement); *Travis v. Boulevard Bank, N.A.*, 880 F. Supp. 1226, 1230 (N.D. Ill. 1995) (finding TILA violation as "the result of Defendant's departure from the contract").

159.    In addition, Citigroup violated the TILA by, *inter alia*: (i) adversely changing the terms of mortgage loans after origination without consent and demanding more insurance than previously required in amounts greater than necessary to protect its interest in the property; and (ii) failing to provide proper notice, after origination, that Citigroup was amending the terms of loans as described in the relevant mortgage documents.  *See Hofstetter v. Chase Home Fin., LLC*, 751 F. Supp. 2d, 1116, 1123-28 (N.D. Cal. 2010) (upholding claim that "the bank violated the requirements of the TILA by adversely changing, without authorization or providing proper notice to the borrower, the terms of the HELOCs in question via [] flood insurance 'form

letters'"); *Wulf I*, 798 F. Supp. 2d at 599-600 ("Plaintiff's TILA claim survives the motion to dismiss. . . . Plaintiff's TILA claim is based on the change in flood insurance requirements[.]")

160.    The TILA violations set forth above occurred within one year of the commencement of this action.  To the extent that the violations described above occurred earlier, Mr. Skinner did not discover and did not have a reasonable opportunity to discover Citigroup's violations until Citigroup notified him that it was necessary for him to increase his flood insurance coverage because his existing coverage allegedly was deficient.  Prior to this time, Mr. Skinner had no reason or opportunity to complain about any TILA violations by Citigroup.

161.    Mr. Skinner's TILA claim is timely.  The statute of limitations on his TILA claim did not begin to run and/or was equitably tolled until such time that he had a reasonable opportunity to discover Citigroup's TILA violations and complain about such violations.  It would be manifestly unjust and inconsistent with the purposes of TILA to apply and enforce an earlier accrual date for Mr. Skinner's TILA claim.

162.    Citigroup systematically and pervasively engaged in similar violations of TILA to the detriment of other members of the Citigroup Over-Insured Class.

163.    Mr. Skinner and the Citigroup Over-Insured Class have been injured and have suffered a monetary loss as a result of Citigroup's violations of TILA.  Pursuant to the terms of Mr. Skinner's form mortgage, the unauthorized charges for flood insurance were added to his loan balance, are accruing interest.  *See Exhibit 1, ¶9* ("Any amounts disbursed by Lender . . . shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement[.]")

164.    As a result of Citigroup's violations, Mr. Skinner and the Citigroup Over-Insured Class are entitled to recover actual damages and a penalty of $500,000 or 1% of Citigroup's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

165.    Plaintiff Skinner and the Citigroup Over-Insured Class also are entitled to recovery of attorneys' fees and costs to be paid by Citigroup, as provided by 15 U.S.C. § 1640(a)(3).

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**BREACH OF CONTRACT / BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

**(Asserted against Midland by Plaintiff Casey)**

166.    Plaintiff Casey alleges and incorporates by reference the allegations in the preceding paragraphs.

167.    Mr. Casey's mortgage is a standard form FHA mortgage.

168.    Midland has been the lender-in-interest to Mr. Casey's mortgage and has serviced the mortgage from the time it acquired the mortgage in 2011 until the present date.

169.    Midland is bound by the terms of the mortgage.

170.    Mr. Casey's mortgage does not require flood insurance coverage in an amount greater than the amount of his outstanding principal balance.

171.    Midland breached the terms of Mr. Casey's mortgage by requiring him to obtain and maintain flood insurance in excess of the amount required under his mortgage, and by force-placing flood insurance in excess of the amount required under his mortgage.

172.    Midland also breached the terms of Mr. Casey's mortgage by arranging for commissions or kickbacks in connection with force-placed flood insurance.

173.   Plaintiff Casey's mortgage provides that "Lender may collect fees and charges authorized by the Secretary" of HUD.  *See Exhibit 7, ¶ 8.*  Kickbacks or commissions in connection with force-placed insurance are not authorized by HUD.  *See Exhibit 20.*

174.   The foregoing breaches were not isolated.  Midland similarly breached the mortgage agreements of other Midland Class members by requiring them to obtain and maintain flood insurance in excess of the amount required under their mortgage agreements, by force-placing flood insurance in excess of the amount required under their mortgage agreements, and or by arranging for kickbacks or commissions in connection with force-placed flood insurance.

175.   Midland also breached the implied covenant of good faith and fair dealing inherent in Mr. Casey's mortgage and the mortgages of other Midland Class members.

176.   Midland owed Mr. Casey and the Midland Class members a duty of good faith and fair dealing, by virtue of Midland's contractual relationship with Mr. Casey and other Class members.

177.   Midland breached this duty by, among other things: (1) demanding and/or force-placing flood insurance coverage in excess of the amount required by federal law or the relevant mortgage documents, and in excess of the amount required to protect Midland's legitimate financial interests; (2) unreasonably exercising in bad faith any purported discretionary authority Midland claims it was afforded under the loan and mortgage documents, (3) imposing contractual requirements that did not exist or that exceeded the requirements disclosed in the relevant loan and mortgage documents; and (4) arranging for kickbacks, commissions, or other compensation for its affiliate in connection with lender-placed insurance.

178.   Midland willfully engaged in the foregoing conduct in bad faith, for the purpose of: (1) gaining unwarranted contractual and legal advantages; (2) unfairly and unconscionably

maximizing revenue from Mr. Casey and other Class members; and (3) generating commissions, kickbacks, or other compensation for Midland or its affiliates.

179.   The foregoing breaches were willful and not the result of mistake or inadvertence. Midland systematically and pervasively required Mr. Casey and other Midland Class members to obtain flood insurance in excess of the amount required under their mortgage documents, in excess of the amount required by federal law, and in excess of the amount that Midland could fairly and reasonably demand in good faith.  Midland also pervasively arranged for commissions for itself or its affiliate, FirstInsure, in connection with lender-placed flood insurance.

180.   As a direct result of Midland's breaches of contract and breaches of the implied covenant of good faith and fair dealing, Mr. Casey and the Midland Class members have been injured, and have suffered actual damages and monetary losses, in the form of increased insurance premiums, interest payments, and/or other charges.

181.   Plaintiff Casey and the Midland Class members are entitled to recover their damages and other appropriate relief for the foregoing contractual breaches.

### EIGHTH CLAIM FOR RELIEF
#### UNJUST ENRICHMENT
**(Asserted against Midland and FirstInsure by Plaintiff Casey)**

182.   Plaintiff Casey alleges and incorporates by reference the allegations in the preceding paragraphs.

183.   Midland and/or its affiliate, FirstInsure, have been unjustly enriched as a result of the conduct described in this Complaint and other inequitable conduct.

184.   Midland received a benefit from Mr. Casey and the Midland Lender-Placed Class members in the form of payments for force-placed flood insurance coverage, and Midland and/or FirstInsure retained a portion of these payments as commissions or other compensation.

185.    Retention of these payments by Midland or FirstInsure would be unjust and inequitable.  The NFIA only allows lenders and servicers to "charge the borrower for the cost of premiums and fees incurred by the lender or servicer for the loan in purchasing the insurance." 42 U.S.C. § 4012(e)(2); *see also* 12 C.F.R. § 22.3.   Moreover, HUD prohibits kickback or commission arrangements in its Lender's Manual, and these types of kickbacks or commissions are also prohibited by Fannie Mae.  For these reasons and the other reasons stated above, Midland abused its discretion to pass through costs for force-placed flood insurance, by charging Mr. Casey and other Midland Lender-Placed Class members amounts in excess of the net costs incurred by Midland for such insurance, and it was improper for Midland and/or FirstInsure to retain at least a portion of the premium payments as kickbacks, commissions or other compensation.

186.    The kickbacks, commissions or other compensation that Midland and/or its affiliate, FirstInsure, received in connection with force-placed flood insurance were not legitimately earned, and came at the ultimate expense of Mr. Casey and the members of the Midland Lender-Placed Class who had flood insurance force-placed on them by Midland.

187.    Because it would be unjust and inequitable for Midland and/or FirstInsure to retain such payments through their manipulation of the force-placed insurance process, Mr. Casey and the Midland Lender-Placed Class are entitled to restitution of all monies unjustly and inequitably retained.  Midland and FirstInsure cannot retain these payments in good conscience.

## NINTH CLAIM FOR RELIEF

### BREACH OF FIDUCIARY DUTY / BREACH OF TRUST

#### (Asserted against Midland by Plaintiff Casey)

188.    Plaintiff Casey alleges and incorporates by reference the allegations in the preceding paragraphs.

189.    Mr. Casey's mortgage contains an escrow provision in Paragraph 2 of the mortgage, which is typical of other mortgages originated and/or serviced by Midland.

190.    Paragraph 2 of Mr. Casey's mortgage provides that "Borrower shall include in each monthly payment . . . premiums for insurance[,]" including flood and hazard insurance.

191.    Paragraph 2 of Mr. Casey's Mortgage further provides that the sums included in his monthly payment for insurance premiums are to be held in escrow by his lender.  These funds are to be used for the purpose of paying his insurance premiums when due, and any excess funds are to be returned to Casey under the terms of his mortgage.

192.    Midland has accepted monies from Mr. Casey for insurance premiums on a monthly basis and has held them in escrow, pursuant to Paragraph 2 of his mortgage.

193.    Midland was obligated to hold these escrow funds in trust, and owed Mr. Casey a fiduciary duty with respect to the handling of such funds.

194.    Midland breached its fiduciary duty to Mr. Casey and other members of the Midland Escrow Subclass: (1) by unilaterally using escrow funds to purchase flood insurance that Plaintiff and other Subclass members did not want and were not required to obtain; and (2) profiting from force-placed insurance policies that were purchased from escrow funds at the expense of Mr. Casey and other Subclass members.

195.    These actions were undertaken by Midland in bad faith for its own benefit and were not intended to benefit Mr. Casey or other borrowers.

196.    As a direct result of Midland's actions, Mr. Casey and the Midland Escrow Subclass have suffered injuries in the form of unnecessary and excessive escrow charges, a loss of funds from their escrow accounts, increased mortgage payments due to alleged escrow "shortages," and related injuries.

197.   Plaintiff Casey and the Midland Escrow Subclass are entitled to damages for Midland's beaches of its fiduciary obligations and misappropriation of escrow funds.   In addition, Mr. Casey and the Midland Escrow Subclass are entitled to punitive damages because Midland acted in bad faith in deliberate and/or reckless disregard of their rights and its obligation to hold their escrow funds in trust.

**TENTH CLAIM FOR RELIEF**

**CONVERSION**

**(Asserted against Midland by Plaintiff Casey)**

198.   Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

199.   Midland had and continues to have a duty to maintain and preserve customers' mortgage accounts, and mortgage escrow accounts, and to prevent their diminishment or alteration through its own wrongful acts.

200.   Midland wrongfully and intentionally collected insurance premiums from customers' mortgage escrow accounts or added such payments to customers' mortgage accounts.

201.   Midland collected these premiums by wrongfully and intentionally withdrawing specific and readily identifiable funds from mortgage customers' escrow accounts or misappropriating funds paid to customers' account balances for their regular monthly mortgage payments in order to fund its force-placed insurance scheme.

202.   Midland has assumed and exercised the right of ownership over these funds without authorization to do so and in hostility to the rights of Mr. Casey and the Midland Escrow Subclass without legal justification.

203.   Midland has retained these funds unlawfully without the consent of Mr. Casey and the Midland Escrow Subclass and has deprived them from exercising control over the funds.

204.     Midland intends to permanently deprive Mr. Casey and the Midland Escrow Subclass of these funds.

205.     Mr. Casey and the Midland Escrow Subclass properly own these funds, not Midland, who now claims that it is entitled to ownership of the funds contrary to the rights of Mr. Casey and the Midland Escrow Subclass.

206.     Mr. Casey and the Midland Escrow Subclass are entitled to the immediate possession of these funds.

207.     Midland has wrongfully converted these specific and readily identifiable funds.

208.     Midland's wrongful conduct is of a continuing nature.

209.     As a direct and proximate result of Midland's wrongful conversion, Mr. Casey and the Midland Escrow Subclass have suffered and continue to suffer damages.  Mr. Casey and the Midland Escrow Subclass are entitled to recover from Midland all damages and costs permitted, including all amounts that Midland wrongfully converted, which are specific and readily identifiable.

**ELEVENTH CLAIM FOR RELIEF**

**VIOLATION OF NEW YORK DECEPTIVE PRACTICES ACT ("NYDPA")**
**N.Y. Gen. Bus. Law § 349, *et seq.***

**(Asserted against Midland by Plaintiff Casey)**

210.     Plaintiff Casey alleges and incorporates by reference the allegations in the preceding paragraphs.

211.     Midland was required to adhere to the requirements of the NYDPA when conducting business with Mr. Casey and other Midland New York Subclass Members.  Midland provided credit and related services to Mr. Casey and the members of the Midland New York Subclass for personal, family, and/or household purposes.

212.    The NYDPA provides that "deceptive acts or practices in the conduct of any business, trade, or commerce, or in the furnishing of any service in this state are hereby declared unlawful."

213.    Midland pervasively violated the NYDPA during the relevant period, and continues to violate this statute, by virtue of the unfair, deceptive, and fraudulent practices described herein.

214.    Among other things, Midland violated the NYDPA by:

a)      illegitimately demanding and force-placing excessive and unnecessary flood insurance on property owned by Mr. Casey and other Midland New York Subclass members, in amounts greater than required by law, greater than Midland's financial interest, and contrary to the amounts agreed upon in their borrower agreements;

b)      fraudulently and deceptively misrepresenting the amount of flood insurance that Mr. Casey and the other New York Subclass are required to maintain under their mortgage agreements;

c)      materially misrepresenting to Mr. Casey and other Midland New York Subclass members that their mortgages conferred obligations on them that they did not have;

d)      deceptively charging Mr. Casey and other Midland New York Subclass Members amounts in excess of the net costs incurred for force-placed insurance;

e)      deceptively suggesting that it was a legitimate business practice for Midland to arrange for commissions on force-placed insurance through its affiliate, FirstInsure; and

f)      engaging in other unconscionable and deceptive conduct as set forth in the Complaint.

215.    Midland engaged in such violations for the purpose of: (1) unfairly and unconscionably maximizing revenue from Mr. Casey and other Midland New York Subclass members; (2) generating commissions, kickbacks, or other compensation for Midland and/or FirstInsure; (3) gaining unwarranted contractual and legal advantages; and (4) inducing and/or forcing Mr. Casey and other Midland New York Subclass members to procure unnecessary and/or excessive amounts of flood insurance.[15]

216.    Midland willfully engaged in such conduct and knew that it violated the NYDPA or showed reckless disregard for whether it violated the NYDPA.

217.    As a result of Midland's violations of the NYDPA, Mr. Casey and the Midland New York Subclass have been injured and have suffered actual damages and monetary losses in the form of increased insurance premiums, interest payments, and/or other fees and charges.

218.    Plaintiff Casey and the Midland New York Subclass members are entitled to actual damages, statutory damages, treble damages, injunctive relief, attorneys' fees and costs, and any other remedies available under the NYDPA or in equity, for Midland's violations of the NYDPA.  *See* N.Y. Gen. Bus. Law § 349(h)

**TWELFTH CLAIM FOR RELIEF**

**VIOLATION OF THE TRUTH IN LENDING ACT**

**(15 U.S.C. § 1601, *et seq.*)**

**(Asserted against Midland by Plaintiff Casey)**

219.    Plaintiff Casey alleges and incorporates by reference the allegations in the preceding paragraphs.

---

[15] Plaintiff Casey and the Midland New York Subclass reasonably and justifiably relied on Midland to, *inter alia*, fully, honestly and fairly disclose the amount of insurance that was required for their property under their mortgages and federal law, and to interpret and/or apply such requirements reasonably and fairly in good faith.

220.   Residential mortgage loan agreements are subject to the disclosure requirements of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq*., and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

221.   Midland is a "creditor" as defined by the TILA.

222.   Under the TILA, Midland is required to accurately and fully disclose the terms of the legal obligation between the parties.  *See* 12 C.F.R. § 226.17(c)(1) ("The disclosures shall reflect the terms of the legal obligation between the parties.").  This duty to make truthful and accurate disclosures is an ongoing duty, and applies to both subsequent disclosures and initial disclosures at the time of the loan transaction.  *See Hubbard v. Fidelity Fed. Bank*, 91 F.3d 75, 79 & n.7 (9th Cir. 1996) (rejecting defendant's argument that 12 C.F.R. § 226.17(c) "only applies to disclosures before consummation of the transaction"); *Demando v. Morris*, 206 F.3d 1300, 1303 (9th Cir. 2000) ("Because the Notice contained terms that were in violation of the credit agreement, the Notice violated Regulation Z.").

223.   Midland violated TILA by misrepresenting to Mr. Casey and other Midland Over-Insured Class members that they were required to purchase flood insurance in amounts greater than required under their mortgage agreements and greater than necessary to secure their outstanding principal balance.  *See Wulf I*, 798 F. Supp. 2d at 597-99 (denying motion to dismiss FHA borrower's claims for violation of the TILA, based on "Defendant's departure from the mortgage documentation" by force-placing insurance in excess of the amount required by Plaintiff's mortgage); *accord, Gooden*, 2012 WL 996513, at *4-5; *Travis*, 880 F. Supp. at 1230.

224.   In addition, Midland violated the TILA by, *inter alia*: (i) adversely changing the terms of mortgage loans after origination without consent and demanding more insurance than previously required in amounts greater than necessary to protect its interest in the property; and

(ii) failing to provide proper notice, after origination, that Midland was amending the terms of loans as described in the relevant mortgage documents.  *See Hofstetter v. Chase Home Fin., LLC,* 751 F. Supp. 2d, 1116, 1123-28 (N.D. Cal. 2010) (upholding claim that "the bank violated the requirements of the TILA by adversely changing, without authorization or providing proper notice to the borrower, the terms of the HELOCs in question via [] flood insurance 'form letters'"); *Wulf I,* 798 F. Supp. 2d at 599-600 ("Plaintiff's TILA claim survives the motion to dismiss. . . . Plaintiff's TILA claim is based on the change in flood insurance requirements[.]")

225.   The TILA violations set forth above occurred within one year of the commencement of this action.  To the extent that the violations described above occurred earlier, Mr. Casey did not discover and did not have a reasonable opportunity to discover Midland's violations until Midland notified him on December 23, 2011 that it was necessary for him to increase his flood insurance coverage because his existing coverage allegedly was deficient. Prior to this time, Mr. Casey had no reason or opportunity to complain about any TILA violations by Midland.

226.   Mr. Casey's TILA claim is timely.  The statute of limitations on his TILA claim did not begin to run and/or was equitably tolled until such time that he had a reasonable opportunity to discover Midland's TILA violations and complain about such violations.  It would be manifestly unjust and inconsistent with the purposes of TILA to apply and enforce an earlier accrual date for Mr. Casey's TILA claim.

227.   Midland systematically and pervasively engaged in similar violations of TILA to the detriment of other members of the Midland Over-Insured Class.

228.   Mr. Casey and the Midland Over-Insured Class have been injured and have suffered a monetary loss as a result of Midland's violations of TILA.  Pursuant to the terms of

Mr. Casey's FHA form mortgage, the unauthorized charges for flood insurance were added to his loan balance, are accruing interest. *See Exhibit 7, ¶7* ("Any amounts disbursed by Lender . . . shall become an additional debt of the Borrower secured by this Security Instrument.  These amounts shall bear interest from the date of disbursement, at the Note rate[.]").

229.    As a result of Midland's violations, Mr. Casey and the Midland Over-Insured Class are entitled to recover actual damages and a penalty of $500,000 or 1% of Midland's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

230.    Plaintiff Casey and the Midland Over-Insured Class also are entitled to recovery of attorneys' fees and costs to be paid by Midland, as provided by 15 U.S.C. § 1640(a)(3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the Classes, pray for relief as follows:

a)    Determining that this action may proceed as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure;

b)    Designating Plaintiffs as representative for the Classes;

c)    Designating Plaintiffs' counsel as counsel for the Classes;

d)    Issuing proper notice to the Classes at Defendants' expense;

e)    Declaring that Defendants breached the terms of Plaintiffs' mortgages and the mortgages of other Over-Insured Class members, and breached its duty of good faith and fair dealing to Plaintiffs and other Over-Insured Class members;

f)    Declaring that Defendants' conduct was inequitable and that Defendants were unjustly enriched by such conduct;

g)      Declaring that Defendants breached their fiduciary duties to Plaintiffs and the Escrow Subclass members, and wrongfully converted their escrow funds;

h)      Declaring that Defendants' actions violated the NYDPA;

i)      Declaring that Defendants' actions violated the TILA;

j)      Determining that Defendants acted willfully in deliberate or reckless disregard of applicable law and the rights of Plaintiffs and Class members;

k)      Awarding appropriate equitable relief, including but not limited to an injunction requiring Defendants to reverse all unlawful, unfair, or otherwise improper charges for flood insurance coverage, allowing customers to close loans or credit lines without first paying premiums for insurance that was not necessary or required by law, prohibiting Defendants from imposing unfair and unlawful flood insurance requirements on borrowers, prohibiting Defendants and their affiliates from earning commissions or other compensation on force-placed insurance policies, and ordering Defendants to cease and desist from engaging in further unlawful conduct in the future;

l)      Awarding actual damages, applicable statutory damages, treble damages, punitive damages, penalties, and interest;

m)      Awarding reasonable attorneys' fees and costs and expenses; and

n)      Granting other and further relief, in law or equity, as this Court may deem appropriate and just.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs and the Classes demand a trial by jury.

Dated: July 26, 2012                    Respectfully submitted,

                                        **NICHOLS KASTER, PLLP**


                                        */s/ Donald H. Nichols*
                                        Donald H. Nichols, Bar Roll No. 515017
                                        Kai Richter, MN Bar No. 0296545*
                                        E. Michelle Drake, MN Bar No. 0387366*
                                           *(admitted *pro hac vice*)
                                        4600 IDS Center
                                        80 South Eighth Street
                                        Minneapolis, MN 55402
                                        Telephone: (612) 256-3200
                                        Fax: (612) 215-6870
                                        Email: nichols@nka.com
                                                krichter@nka.com
                                                drake@nka.com


                                        Shanon J. Carson**
                                        Sarah R. Schalman-Bergen**
                                        Patrick F. Madden**
                                           **(*pro hac vice* applications forthcoming)
                                        BERGER & MONTAGUE, P.C.
                                        1622 Locust Street
                                        Philadelphia, PA  19103
                                        Telephone: (215) 875-4656
                                        Facsimile: (215) 875-4604
                                        Email: scarson@bm.net
                                                sschalman-bergen@bm.net
                                                pmadden@bm.net


                                        Brett Cebulash **
                                        Kevin S. Landau**
                                           **(*pro hac vice* applications forthcoming)
                                        TAUS, CEBULASH & LANDAU, LLP
                                        80 Maiden Lane, Suite 1204
                                        New York, NY 10038
                                        Telephone: (212) 931-0704
                                        Facsimile: (212) 931-0703
                                        Email: bcebulash@tcllaw.com
                                                klandau@tcllaw.com


                                        **ATTORNEYS FOR PLAINTIFFS**